UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
MICHAEL JOHN GEDEON,                    \*
    Plaintiff                          \*
                                    \*
                                    \*
                                    \*
VS.                                     \*
                                    \*
                                    \*
DEMATTEO CONSTRUCTION COMPANY,          \*
AND CARPENTER'S LOCAL UNION #108        \*
    Defendant                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

     DEPOSITION of **MICHAEL JOHN GEDEON,** called by Counsel

on behalf of the **Defendant** pursuant to the applicable provisions

of the Massachusetts Rules of Civil Procedure, before Donna

O'Connor, a Professional Court Reporter and Notary Public in and

for the Commonwealth of Massachusetts, at the Law Offices of

**Suzanne B. Matthews, 742 Washington Street, Canton,**

**Massachusetts 02021, on March 21, 2006,** commencing at **12:45 p.m.**

**APPEARANCES:**

on behalf of the Defendant,
DeMatteo Construction Company:
Suzanne B. Matthews, Esq.
Law Offices of Suzanne B. Matthews
742 Washington Street
Canton, MA 02021
(781) 828-0989

on behalf of the Defendant,
Local Union #108
Christopher N. Souris, Esq.
Krakow & Souris, LLC
225 Friend Street
Boston MA 02114
(617) 723-8440

Also present:

Simon R. James

1    A.   To tell you frankly speaking, do I believe that was

2    the reason?  I'll be honest with you, there was -- there

3    was -- there was work to be -- to be -- to be done, but why

4    they shut it down, same old story that goes on in different

5    jobs.  You know, company's want to -- want to -- want to

6    slow down or whatever, and they find -- they find avenues

7    to say, well, you know, "We can't do this, we can't do

8    that.  We gotta wait till the State open up this and open

9    up that."  And then, you know, they're going to lay off and

10    once they get the okay, they're going to call back, and --

11    Q.   Why do you think you were laid off on June 27th 2003?

12    A.   Well, they told me it was lack of work.

13    Q.   Do you think you were laid off on June 27th 2003 for

14    any other reason?

15    A.   No, I don't think I was laid off for any other reason

16    but the job just came to a halt, where, you know, there's

17    nothing -- we can't do anything until they tell us to do.

18    Q.   Now, paragraph eleven of your Complaint of

19    Discrimination filed at the MCAD, you state, "On or about

20    July 21st 2003, you were re-hired by DeMatteo Construction,

21    correct?

22    A.   Paragraph what?

23    Q.   Eleven.

1    A.    Yeah.

2    Q.    How did that come to be that you were re-hired by

3    DeMatteo in July -- on July 21st 2003?

4    A.    June 27th till July 21st.  How did that come about?  I

5    guess they were calling back --

6    Q.    I guess -- if you can -- not what you guess, to the

7    best of your recollection today, how did it come about that

8    you were hired -- re-hired on July 21st 2003 by DeMatteo

9    Construction?

10   A.    Well, DeMatteo was calling back -- they were calling

11   back their employees, from --

12   Q.    Did someone call you back?

13   A.    -- from the layoff.

14   Q.    Did someone call you from DeMatteo Construction?

15   A.    I think it was Richie.

16   Q.    Masucci?

17   A.    Yeah.

18   Q.    And what do you recall Rich Masucci said to you?

19   A.    It's just that -- their -- their callback.  I can't --

20   I can't recall exactly, you know, word to work what he said

21   then, but I know that -- I was aware that the job is -- is

22   opening up.

23   Q.    And Mr. Masucci offered you another job -- offered to

```
 1      re-hire you back to DeMatteo Construction, is that correct?
 2      A.   Yes.  He called me back.  Cause every -- everybody was
 3      -- I wasn't the only one laid off.
 4      Q.   And you came back to work?
 5      A.   And I came back, yeah.
 6      Q.   On paragraph twelve of your charge of discrimination,
 7      you state on or about September 12th 2003, complainant was
 8      again laid off by respondent, DeMatteo Construction, is
 9      that correct?
10      A.   Yes.
11      Q.   All right.  And, what if any -- how were you informed
12      by DeMatteo Construction that you were being laid off on or
13      about September 12th 2003?
14      A.   The same way as the first layoff.
15      Q.   And what was that?
16      A.   By the gentleman -- the foreman. Adam.
17      Q.   Was anyone else laid off on September 12th 2003?
18      A.   Yes.  I think everybody was, I think.
19      Q.   And did anyone from DeMatteo Construction Company at
20      this time tell you why you were laid off?
21      A.   For the same reasons as the first time.
22      Q.   Which is what?
23      A.   That I can recall.  That there's no work -- lack of
```

1    work.  Or just -- just something is holding up the job, or,

2    you know, to that -- to that effect.

3    Q.    Is it your understanding that you were in fact laid

4    off on September 12th 2003 because of lack of work?

5    A.    That's what I was told.

6    Q.    But I'm asking you what you thought.  What you,

7    sitting here today, do you think the reason you were laid

8    off on September 12th 2003 by DeMatteo Construction was

9    because of lack of work?

10    A.    Do you want me to be honest with you?  I thought along

11    there was work, but some time along the way, something came

12    up where the job had to be stopped, because something else

13    had to be done.  And lay people off.

14    Q.    Do you think -- sitting here today, do you think there

15    was any other reason other than lack of work why you were

16    laid off on September 12th 2003?

17    A.    Well, it couldn't be -- it couldn't be for any other

18    reason but lack of work.

19    Q.    I believe on -- looking at paragraph thirteen, it

20    states or about October 14th, 2000 you were re-hired by

21    DeMatteo Construction, correct?

22    A.    Yes.  Paragraph fourteen, right?

23    Q.    Paragraph thirteen.

**Donna O'Connor**
**(781) 575-8000**

1    A.    Thirteen, yes.

2    Q.    What do you recall about the circumstances under which

3    you were re-hired on October 14th, 2003?

4    A.    Same thing.

5    Q.    And what is that?

6    A.    That the job was shut down due to the -- they're

7    telling us there's nothing to do, and we're gonna get laid

8    off, and then they -- they were calling back.

9    Q.    And, did you come back to work on October 14th 2003?

10   A.    Yes, I did.

11   Q.    And when were you next laid off from DeMatteo

12   Construction?

13   A.    After October 13th -- October 14th, that was on

14   December 3rd.  December 3rd or December 5th.  Somewhere

15   around there.

16   Q.    December 5th 2003?

17   A.    2003.

18   Q.    And how were you informed that you were being laid off

19   on December 5th 2003?

20   A.    Same as the first, second and third time.  By Adam

21   telling us that, you know, we were being laid off.

22   Q.    And who else was laid off on December 5th 2003?

23   A.    Everybody was laid off I was told.

1     Q.   And what was the reason you were told that you were

2     being laid off on December 5th 2003?

3     A.   They said that they waiting for -- something to do

4     with the state.  They gotta get an okay to -- to start work

5     somewhere.  What we were doing, we couldn't go any further.

6     We had to come to a stop.  And they said that -- something

7     to the effect that they are going to have to wait to open

8     up another area, or the -- the work the men were doing down

9     the other end was -- was halting us from proceeding.  You

10    know, you hear different things, so I go by what I -- what

11    I -- what I hear.

12    Q.   Were you laid off on December 5 2003 from DeMatteo

13    Construction because of lack of work?

14    A.   That's what they said.

15    Q.   What is your understanding?  What do you believe?  You

16    believe you were laid off from work on December 5th 2003

17    because of lack of work?

18    A.   There's nothing else to believe but that.

19    Q.   Looking on paragraph fourteen, you state, "As a result

20    of the respondent DeMatteo's unlawful and discriminatory

21    conduct and employment practices in violations of

22    complainant's rights protected by Federal and State law,

23    complainant was laid off/discharged from his employment on

1    or about December 5th 2003."   Can you state for me all

2    facts that you know, sitting here today, that support this

3    allegation in paragraph fourteen?

4    A.    Well, I gotta say this. And I'm going to say it

5    straight and clear.  Throughout all his layoffs here,

6    first, second and third, I had observed my business agent,

7    Simon James, coming to the job and making that statement.

8    Soon after he left the job, I had realized that things

9    weren't -- put it like, as it -- as it -- as it was with

10   the members that I was working with -- with -- with the

11   other union members, especially my union steward.

12   Q.    Before that, I want -- what -- when you said, "You

13   observed Simon James coming to the job," correct?

14   A.    Mm, hmm.

15   Q.    How many times did you observe Simon James coming to

16   the job?

17   A.    I think I probably saw him either once or twice.

18   Q.    So between April, 2002 -- I'm sorry, strike that.

19   Between April 2003, and December 2000 -- December 3, 2005,

20   you saw Simon James come to the job one to two times?

21   A.    I think it's about -- I think it's probably two

22   occasions.  Not positive, but I think it's two.  One -- the

23   first one was earlier in the year.  And that's when I had

1    noticed the -- the change in the attitude and in the moods

2    of the men that I work with.

3        Q.   All right.  Before we -- I ask you about the change in

4    the attitude, what I'm looking to focus on is when you saw

5    -- the first time Simon James came to the, to the best

6    of your recollection, what time of the year was it?

7        A.   I think it was somewhere around early -- early summer

8    -- early summer.  Somewhere in the summer.

9        Q.   And what did you observe on that visit?

10       A.   That -- I think that he was talking with my steward.

11       Q.   And who was that?

12       A.   Steve Carrington.

13       Q.   What do you mean you think he was, do you recall him

14   talking to your steward?

15       A.   Yes.

16       Q.   And how close were you to Simon James and your steward

17   when this conversation was occurring?

18       A.   I was at a distance.  I would say I was at a distance,

19   maybe about from the parking lot.

20       Q.   Approximate distance.  How many feet?

21       A.   Maybe about fifty feet or so.

22       Q.   Could you hear any of the conversation that was going

23   on between Mr. James and Mr. Carrington?

1    A.    No. No. No. No, I just saw.

2    Q.    Could you explain what -- on the -- did you see on

3    that date, Mr. James speaking to anybody else?

4    A.    I didn't quite pay any attention. I just know that I

5    saw him there talking to one gentleman.

6    Q.    Did anyone ever tell you what the nature and substance

7    of the conversation was on that day between Simon James and

8    your steward?

9    A.    No.

10   Q.    Now, I believe you stated that there was a second time

11   that Mr. James came  to the job, correct?

12   A.    I think there was a second time. Cause I remember a

13   time when he handed me am apple. I was walking right past

14   him. But I -- I didn't pay any  attention. I just went

15   about my business.

16   Q.    Did you see Mr. James speaking to anybody else on that

17   day?

18   A.    I -- I didn't pay any attention. I just -- I just

19   went along with him.

20   Q.    I believe you testified, and this is in general,

21   something about you observed Simon James coming to the job

22   and making a statement. Anything else other than you've

23   just testified to, that you sit here today, you can recall

```
1              ATTY. SOURIS:  You're always free to take a break.
2              THE WITNESS:  Okay.  Great.  Wonderful.
3                          (Short Recess.)
4    Q.   All right, Mr. Gedeon, I believe I was questioning
5    you, and you started to answer, and then we took a break.
6    Again, I'm just trying to focus and to nail down on
7    paragraph fourteen of your charge of discrimination, when
8    you make reference to allegations that you were laid off,
9    or discharged from employment December 5th 2003 because of
10   unlawful and discriminatory conduct by DeMatteo
11   Construction.  And I'm just asking you, sitting here today,
12   all facts that you recall that support that your layoff on
13   December 5th, 2003 was the result of discriminatory and
14   unlawful conduct by DeMatteo Construction?
15   A.   Okay.  As I -- as I did mention that I had observed
16   different treatment on the job by the men I work with once
17   my business agent had showed up on the job and was gone.  I
18   noticed that the attitudes of the people I worked weren't
19   the same, and I just knew that something was on it's way.
20   Something was coming.  And I did put everything together.
21   I see the treatment that I got even from my -- from my
22   steward, down to Adam.  What I said was horseplay.  And I
23   called it horseplay, but it wasn't really horseplay, but,
```

1    you know, we called it horseplay. Jumping on this board,

2    trying to throw me off the board. And eventually I lost my

3    balance and fell in this four foot hole. And I fell -- I

4    could have been hurt in there. So that kind of -- that

5    kind of environment. And, also that my steward, he would

6    park his vehicle right next to my door, so I can't get into

7    my truck on several occasions. And I mentioned to him, the

8    first time, you know, nicely, don't do that. There's no

9    need for that. You know, the parking lot is empty. It's

10   only us parking in here. You know, you can park over

11   there. And, he did it again. And, I could recall showing

12   one -- one employee what was going on. I think that was

13   Pat Falvey. I -- I remember showing, I think it was Pat

14   Falvey, that -- there's no need for that. When you do

15   something like that, what do you expect me to do? Come in

16   here and -- and try to challenge you and -- and get all

17   hostile? Of course that's what you're looking for. You

18   know, so, I -- I don't operate like that. Adam -- my

19   steward and Adam, they were like this. It's like he was

20   Adam's back pocket. I'm saying, wait a minute. You're not

21   giving your men support, but you're like, you know, a

22   steward is supposed to be with his members. And I had -- I

23   had the experience of that before. Many other jobs. So, I

1    joined in there.  That's -- in fact, that was -- that was

2    when Simon left the job -- when he -- when he first came to

3    the job.

4    Q.   After Simon left the job?

5    A.   Yeah.  Sometime around there.

6    Q.   You approached Rich Masucci?

7    A.   I told -- yeah, I had a word with him.

8    Q.   And was anyone else present during this conversation?

9    A.   No, it was just him and I because I had noticed

10   attitudes changing on the job towards me.

11   Q.   Well, how many -- how long after the day that Simon

12   James was there, did you have this conversation with Rich

13   Masucci?

14   A.   To be honest with you, I can't quite -- I can't quite

15   recall?

16   Q.   And what did you say to him?

17   A.   I mentioned to him that I've had a complaint pending

18   with the EEOC against the union.

19   Q.   And was there a complaint pending at that point?

20   A.   Yes.

21   Q.   And what was Rich's response?

22   A.   I think his response was like, you know, tell him --

23   you know, like explain to him.  You know.

1     Q.    What do you mean, explain to him?

2     A.    What's going on.

3     Q.    He asked you what it was about?

4     A.    Right.  Something like that.  You know, I can't -- in

5           detail, word like he spot out, but it was like, you know,

6           informed him, you know, what's the problem with me and my

7           union.  You know, and I -- I explained to him, you know.

8           First, it's a long story.  But now I have a pending

9           situation with the EEOC, you know.  And I can't remember

10          too far into detail, but I know that I told him that, you

11          know, we are not on full page.  We not on good -- good

12          stan ing right now.  Because there is a complaint with the

13          EEOC that I brought against my business agent.  And, after

14          -- after telling him that, going down to the question you

15          asked me about the layoff in December 5th, the EEOC -- let

16          me back up a little bit.  The EEOC was doing an

17          investigation.

18    Q.    During what period of time?

19    A.    During April throughout -- April, May, June, July,

20          August, September, somewhere around there.

21    Q.    Of 2003?

22    A.    2003.

23    Q.    And that was an investigation of your complaint

1    Pushing on me.  And I tried to, you know, get away from

2    these things.  As a matter of fact, I had spoken with

3    Richie about it.  Richie told me that it's Adam and he had

4    had that problem with him before in Boston on one of the

5    jobs.  He had had a problem with him, with somebody else.

6    Q.    So, you're making reference that -- you're alleging

7    that there was a change in the behavior by Adam LaVoie

8    after Simon James came to the job in May of '03?

9    A.    And my steward.

10   Q.    Okay.  I want to take each one at a -- each one

11   separately.  Adam LaVoie, what specific incidents do you

12   remember, not in general terms, what specific incidents do

13   you remember and how many?

14   A.    Well, as far as how many, I don't quite recall, but I

15   know there was a few.  When he would walk into me, you

16   know, I'm working, and he'd walk into me.  Bump into me.  I

17   make it look like it's a joke, and it's not a joke.

18   Q.    How many times did he do that?

19   A.    It happened at least three -- three or more times.

20   Q.    And who was present then?

21   A.    There were other -- there was my -- my steward working

22   close by.  But it's like everybody never seen nothing.

23   Everybody just like, you know, whether they did see, I

1    don't know.

2    Q.    All right.  So he walked into you and bumped into you

3    three or more times.  What else did he do?

4    A.    And stepped -- stepped on my -- stepped on my foot.

5    Q.    When did he do that?

6    A.    On the job.  On the job.  A number of times he did

7    that.

8    Q.    Specifically, what -- where were you when that

9    occurred and what -- what happened?

10    A.    I was -- I was on the job site working.

11    Q.    Where on the job site?

12    A.    Particularly, there were two sides of the job.  There

13    was east side, west side, are you relating to -- or where

14    was I working --

15    Q.    I want to know exactly.  If he stepped on your foot,

16    Adam LaVoie stepped on your foot, for each time he stepped

17    on your foot, what were the circumstances surrounding that

18    -- around that?

19    A.    Well, he would just --

20    Q.    Not what he would, what he did?  What you recall he

21    did?

22    A.    I could show you if --

23    Q.    You're going to need to put it in words.

134

1    A.    He walked -- he walked towards me, right, walked

2    towards me on the job site.  And basically on my foot, and

3    he turns around, and he goes the other way.

4    Q.    How many times did he do that?

5    A.    That happened at least over three times.

6    Q.    Who was present when that happened?

7    A.    I can't recall.  I know that we were working in a

8    close proximity where the other guys were not too far from

9    where I was and where he -- where the act took place.

10   Q.    What else do you recall occurred, or conduct occurred,

11   on behalf of Adam LaVoie between April of '03 and December

12   5th of '03, in which you believe that he was discriminating

13   against you?

14   A.    There was one time I went to the union hall to speak

15   to Simon about it, but the lady at the office told me that

16   he was on the phone.  I waited a while, and he was on the

17   phone for quite some time, and I left.  I went up there to

18   tell him that while I was working on the job, at the bottom

19   of the ramp, Adam and Troy was working.  And, they were

20   down and I was standing -- I think I was either putting

21   some nails into a two by four, bracing up -- bracing up the

22   wall, and the two of them stood right there working.  And

23   he goes and he spits.  And he spits right to my foot.  And

```
1       Q.   Does this oil have some particular smell?

2       A.   Yeah, it -- it has a very loud smell to it, especially

3       when the wind is blowing.  You could probably stand by that

4       car right there, and it hits you.  I think I got -- I'm not

5       too sure if I have it.  But --

6            ATTY. SOURIS:  That's okay.

7       A.   No, no, listen.  Listen.  It's a nice oil.  It's a

8       very nice -- it's a nice oil.  It has a very nice -- but

9       some people just can't take --

10      Q.   Maybe Adam liked the smell.

11      A.   -- odors like that.  You know, they make fun out of

12      it, you know, and try to bring you out, you know.  And I'm

13      not for that, you know.

14      Q.   Anything else that Adam did during that time period?

15      A.   As far as I recall, there's -- there's one more thing.

16      It was raining quite heavy one -- I mean it was storming.

17      And when I first got to the job, Pat Falvey told me that

18      they didn't like him.  They don't want anybody to work with

19      him.  And they sent him to me as my partner.

20      Q.   Who?

21      A.   Pat -- Pat Falvey.

22      Q.   They sent Pat to you as partners?

23      A.   Adam and Steve Carrington, before Troy got there.  And
```

1    him, you know, about that.  Because I don't think the two

2    of them really got on great on that job.

3    Q.    Anything else, sitting here today, that you can

4    recall?

5    A.    As far as I could recall, that's about it.

6    Q.    Now, did you -- on these issues that you raised, for

7    example, Adam LaVoie bumping into you on several occasions,

8    him stepping on your foot, spitting close to your foot,

9    making a comment about something smells, and having you

10   work in the rain, did you make any complaints of any of

11   this to Rich Masucci?

12   A.    I spoke to Rich.  As a matter of fact, I gotta say

13   that Rich was -- he was very much concerned about what was

14   going on on the job because when I told them some of these

15   things that was transpiring, he would make sure that he

16   walked the job.  Anytime that he was coming down, he would

17   ask me, "Is everything all right, Mike?"  You know, and

18   he'd look at me like he knows what I talked to him about is

19   going on.  And, "Is everything going on all right?

20   Everything okay?"  I tell him yes.

21   Q.    After you spoke to him about these incidents, did --

22   was there any change in the behavior by Adam LaVoie?

23   A.    Well, to a point towards the ending.  There was a --

1    there was a -- there was a change towards the ending.  But

2    he had already told me that is -- that's the way Adam is,

3    cause they -- he had problems with him on another job.

4    Q.  What was the change that you said?

5    A.  I -- well, I told Adam straight out one -- one day.

6    "Cut the shit out.  I'm not going to put up for it.

7    Straight out.  Cut it out."  Just like that.  And, I

8    noticed that -- like I said, it -- it just like -- it

9    mellowed out towards the end before -- maybe about -- maybe

10   about November.  November through -- through December.

11   Through the time I got laid off.

12   Q.  Did you see Adam at any time treat any other DeMatteo

13   employees similar --

14   A.  No, I -- no, I didn't observe that.  I didn't observe

15   that.

16   Q.  All right.  Now, at this time, you were also working

17   with Troy Longaker, correct?

18   A.  Who?

19   Q.  Troy Longaker.

20   A.  Troy?  I didn't -- I hardly worked with Troy, because

21   Troy showed that he -- he didn't want to work with me.  He

22   had this thing about him.  And, his partner was mainly

23   Steve Carrington or he wanted to do things by himself.

 1     Q.   Sitting here today, can you recall any actions, any

 2     conduct by Troy Longaker between April in -- April 2003 and

 3     December 5th 2003, that you believe was acting in any

 4     discriminatory manner toward you?

 5     A.   Well, many a times when there was something to be

 6     done, and if I wanted to work with him, help him or

 7     something like that, he would kind of like shush me up,

 8     like, you know, he -- he don't need no help.  He can do it

 9     alone.  And, Steve will come by, and him and Steve will

10     just actually stand there.

11     Q.   What do you specifically -- what do you -- how many

12     times did this occur with Troy Longaker?

13     A.   A number -- a number of times.  A number of times.

14     Q.   Did you ever discuss this with Rich Masucci?

15     A.   No.

16     Q.   Did you ever raise this wit anyone else at DeMatteo

17     Construction?

18     A.   No.  No.  I just left it alone.

19     Q.   Anything -- other than you've just testified to, any

20     other conduct or actions by Troy Longaker during that

21     period of time that you believe were discriminatory towards

22     you?

23     A.   I only saw where he and my steward would -- sometimes

1    stepping on my foot or pushing into me, or Carrington

2    parking next to my door, stuff like that, you know, I would

3    voice that.  But, whatever else, they were trying to make

4    me feel whatever way they wanted me to feel, I just let it

5    be.

6    Q.    Now, Troy Longaker was a journeyman, correct?

7    A.    Yes.  That's what he said he was.

8    Q.    Did he have any supervisory role or capacity above you

9    on the job?

10    A.    Well, actually, even with Adam on the job, he was

11    showing that authority.  And the reason why he was showing

12    that, because I found out the two of them ride together.

13    They are riding buddies..  And, he said one time that he's

14    Adam's buddy for many years.  You know, they go way back.

15    Q.    What about Patrick Falvey, you worked with Patrick

16    Falvey?

17    A.    I worked with Patrick Falvey.

18    Q.    Was there any conduct or actions by Patrick Falvey

19    between April '03 and December 5th '03, that you felt were

20    directed at you for any discriminatory reason?

21    A.    There was one incident that I mentioned to Richie

22    about.

23    Q.    And what was that?

```
 1        "Don't tell me anything before I hit you with my hammer."
 2        Something like that.
 3        Q.   Was that in response that he didn't like what you had
 4        said to him?
 5        A.   Yes.  I -- I would say so.  Because he -- he felt that
 6        he's a journeyman now, I shouldn't tell him nothing.
 7        Simple as that.
 8        Q.   Did you speak to Rich about that?
 9        A.   I told Richie about it.
10        Q.   And what did Richie do?
11        A.   I think I got to know that he has something --
12        something -- if he don't take his medication sometimes, on
13        time, he's -- he's like -- and I -- I never knew that.  I
14        always see him go to the men's room, to the outhouse.  You
15        know, there are times when I saw him kind of like cranky.
16        And he goes in there, and he comes back, and he's fine
17        after that.
18        Q.   After you spoke to Richie about that, did you ever
19        have any problems with Patrick Falvey after that?
20        A.   No, because I -- I spoke to him.  I said, "I was
21        looking out for you, and you turned against me.  You scared
22        the heck out of me.  And, you know, you don't do stuff like
23        that man."
```

1    Q.    Do you believe his conduct toward you that you've

2    testified to was based in any way because of your age?

3    A.    I don't think so.

4    Q.    You've testified as to the conduct that you found

5    offensive as to Adam LaVoie.  Do believe any of that

6    conduct toward you was based upon your race?

7    A.    Frankly speaking, with Adam LaVoie, I'll be honest

8    with you, I saw a change in -- in Adam from -- from when I

9    first knew Adam working on the job.  So that -- that

10   question, I can put it straight to you like this and say,

11   well, he could have changed and -- because his attitude

12   wasn't that as it was before.  Knowing that we had a very

13   warm, you know, completely eight hours when we worked.  And

14   for him to change like that, I could probably say yes.

15   Q.    So, the question is whether or not you think Adam's

16   behavior or conduct toward you that you found offensive was

17   because of your race?

18   A.    I could say so, yes.

19   Q.    And what do you base that on?

20   A.    Based on that -- one of the -- one of the key facts is

21   that I -- I have to tie it up with, since he changed --

22   since he changed his -- his -- his attitude, probably

23   getting to know that I have a beef with my union, and I

1    A.    Yes, because he did comment about -- about my age.  He

2    did tell me that -- most of the time that, you know, like -

3    - your -- like, "You the old man on the job."

4    Q.    When did he say that?

5    A.    Throughout the period of when things began to go, I

6    mean, sour from good.  When I said my business agent showed

7    up on the job, and soon after he left, you know, the

8    attitudes changed.  And, yeah.

9    Q.    Did you ever complain to Rich Masucci or anyone else

10    about these comments?

11    A.    I never -- I never -- I never said to Richie anything

12    about it.

13    Q.    The fact that he allegedly said to you, "You're the

14    old man on the job," did that adversely affect your ability

15    to perform your job in any way?

16    A.    No, it didn't -- it didn't affect my ability.  It's

17    just that, you know, I was bothered by it, because I know

18    I'm the oldest guy.  And I see nine -- nine out of ten

19    times that, you know, he'd rather work with even Troy and

20    Steven than, you know, work with me.  Alongside me.

21    Q.    What about Troy Longaker?  Anything of the behavior

22    that you testified to that you found problematic, do you

23    think any of that was based upon your race?

1    the same thing, yes.

2    Q.   What do you mean by that?  Just because you're a

3    different national origin?

4    A.   I would say yes, because I didn't see him do it to,

5    you know, anybody else.

6    Q.   What about any conduct toward you, did you think was

7    directed toward you by Troy Longaker because of your age?

8    A.   My age with Troy, I never -- I never experience -- I

9    never experienced anything from him.

10   Q.   Same questions about Patrick Falvey.  Any behavior or

11   conduct, you raised that one incident where he threatened

12   you.

13   A.   That was the only incident that I had with Pat.

14   Q.   Do think that was based on any way because of your

15   race?

16   A.   No.  I don't think it was because of my race.  I think

17   it was because that he became a full-pledged journeyman now

18   that, you know, I shouldn't be able to tell him anything.

19   Q.   Do you think it was -- it was directed to you in any

20   way because of your  national origin?

21   A.   No.  I don't think so.

22   Q.   And what about because of your age?

23   A.   No, I don't think so because I think he was -- he was

```
 1      in his late forties too, but I was just older than him. I
 2      didn't -- I didn't see that in him.
 3      Q.    Speaking of Rich Masucci, do you think any of the
 4      conduct that you've testified as to Rich Masucci was
 5      directed at you because of your race?
 6      A.    No.  No, Richie --
 7      Q.    What about because of your national origin?
 8      A.    No, I wouldn't say so.
 9      Q.    And how about because of your age?
10      A.    No, I wouldn't say so.
11      Q.    Is there anything or anybody that you worked with at
12      DeMatteo Construction, other than that you've testified,
13      any other people that you've testified to between April of
14      2003 and December 5th 2003 in which you believe any of
15      their conduct was directed toward you because of your race?
16      A.    The only two people that I really saw changes from was
17      Adam and, what's his name?  Troy.
18      Q.    No one else -- no other representatives of DeMatteo
19      Construction?
20      A.    No, I didn't -- I didn't -- no.
21      Q.    And it's your testimony that you felt that you saw a
22      change in their attitude toward you after you believe --
23      after Simon James was on the job?
```

1     A.    Mm, hmm.

2     Q.    Prior to Simon James being on the job, did you believe

3     that Adam or Troy treated you any differently because of

4     your race?

5     A.    Oh, like I -- like I stated, prior -- prior to that,

6     we had a warm communication.

7     Q.    So that you don't believe -- you don't -- sitting here

8     today, any belief that Adam or Troy treated you different

9     because of you race, prior to Mr. James allegedly coming on

10    the job.

11    A.    Yeah.

12    Q.    And you don't believe that they treated you any

13    differently at that time because of your national origin?

14    A.    Right.  Yes, I would say.

15    Q.    Okay.  And you don't believe they treated you any

16    differently prior to that time because of your age?

17    A.    Yes, I would say.

18    Q.    So, it's fair to say that you believe all of the --

19    I'll paraphrase, adverse, or you may say offensive conduct

20    toward you, by any representatives of DeMatteo

21    Construction, specifically related to your belief that at

22    some point they -- it became known to them that you had a

23    claim against the union?

1     A.   Yes.  And -- I'll just elaborate on that a little bit.

2     After the December 5th, and getting the letter, I would say

3     that, you know, it showed that race, nationality, national

4     origin, whatever it was, age, all came into play one

5     factor.

6     Q.   After you got what letter?

7     A.   After the layoff, and again the letter, and not being

8     re-hired.

9     Q.   Which letter are you --

10    A.   After December 5th.

11    Q.   Okay.  But, but I'm just -- I know after the layoff on

12    December 5th.  Which letter are you referring to?

13    A.   The January letter from him.

14    Q.   The January letter from --

15    A.   From Richie, that he's going to call me back in the

16    spring.

17    Q.   Okay.

18         ATTY. MATTHEWS:  I think -- do you want to suspend

19    now?

20         ATTY. SOURIS:  Yes, that's probably a good idea.

21         ATTY. MATTHEWS:  All right.

22

23                        (Suspended.)